# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **MITZI F. STANLEY,** | ) | |
| Plaintiff, | ) ) ) | Case No. 1:10CV00061 |
| v. | ) ) ) | **OPINION** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,** | ) ) ) ) | By: James P. Jones United States District Judge |
| Defendant. | ) ) | |

*Gregory R. Herrell, Arrington Schelin & Herrell, P.C., Bristol, Virginia for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III; Michelle Scotese, Assistant Regional Counsel; Alexander L. Cristaudo, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Mitzi F. Stanley filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act

(the "Act"), 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2011). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g).

Stanley filed an application for benefits on December 3, 2007, alleging that she became disabled beginning on May 31, 2004, based on migraines, fibromyalgia, carpal tunnel syndrome, irritable bowel syndrome, depression, and anxiety. Her claim was denied initially and upon reconsideration. Stanley received a hearing before an administrative law judge ("ALJ"), during which Stanley, represented by counsel, and a vocational expert testified. The ALJ denied her claim and the Social Security Administration Appeals Council denied her Request for Reconsideration. Stanley then filed her Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Stanley was born on April 15, 1962, making her a younger individual under the regulations. 20 C.F.R. § 404.1563(c) (2011). Stanley is a high school graduate and worked as a stocker at Wal-Mart before the alleged onset of her disability. Her job duties included unloading products from boxes and stocking them on shelves, loading carts, gathering shopping carts and other duties. These duties involved

-2-

Case 1:10-cv-00061-JPJ-PMS   Document 21   Filed 11/20/11   Page 2 of 15   Pageid#: 646

hoisting significant amounts of weight. Stanley left this job in May 2004. She claims she is disabled because of carpal tunnel syndrome, migraine headaches, irritable bowel syndrome, fibromyalgia, depression and anxiety.

Stanley was treated at Wellmont Family Medicine at least from December 2002 through August 2005 for various ailments including acute pharyngitis / sinusitis, GERD syndrome, osteoarthritis, neck pain with torticolllis, allergic rhinitis, carpal tunnel syndrome, migraines, knee pain, abdominal pain, rashes, and generalized malaise.

Stanley underwent a carpal tunnel release on her right wrist in 2004. Though she complains that her right hand swells, subsequent treatment notes indicate no further progression in the carpal tunnel syndrome.

From November 2004 through September 2009, Stanley was treated at Gastroenterology Associates. Her primary complaint was hemorrhoids but she was also diagnosed with GERD, hematochezia, constipation, abdominal pain, dysphagia and irritable bowel syndrome. She was treated primarily for her problems with hemorrhoids. She underwent a colonoscopy and an EGD on October 24, 2008, which revealed Grade B esophagitis, mild gastritis and hemorrhoids.

From September 2005 through September 2009, Stanley was treated at Medical Associates of South West Virginia ("Medical Associates"). She was

primarily seen by Karen Stallard, R.N.C.S., F.N.P. Her major complaints were migraines, GERD, hemorrhoids, fatigue, sinus problems, generalized pain, and depression. At her visit to Medical Associates on December 14, 2006, she reported that she had had sinus surgery and that it had been "very effective" and that her headaches were less frequent.[1] (R. at 263.) At her August, 29, 2007, appointment with Medical Associates, Stanley mentioned some increased stress related to her daughter's recent miscarriage but stated that Cymbalta, prescribed by her rheumatologist, was working enough for her. She said she has occasional migraine headaches. Stanley underwent an MRI on August 12, 2009. The MRI was negative for any abnormalities.

From March 13, 2007 through August 24, 2009, Stanley received treatment for her fibromyalgia from Jeffrey Bieber, M.D., a rheumatologist, and Michelle Flanagan, P.A. at Arthritis Associates. Through the course of her treatment, she complained of pain, plantar fasciitis, problems sleeping, migraines and stress. In April 2007, Stanley reported to Flanagan that she was babysitting a three year old boy from 6:30 a.m. to 8 p.m. and did yoga and pilates. In June 2007, she reported increased stress due to her daughter's miscarriage. She was prescribed many different drugs over time, including Cymbalta, Lyrica, Sonata, Talwin, Zanaflex,

---

[1] On June 29, 2006, David Osterhus, M.D., performed an operation on Stanley to relieve her chronic sinusitis.

Requip, Klonopin, and Ambien. Flanagan also treated Stanley with trigger point injections. The drugs, particularly Cymbalta, helped at least somewhat with her pain and her mood. She reported that the Klonopin helped her sleep and Zanaflex helped her pain. She reported that the migraines were much better since the trigger point injections.

On October 21, 2008, Flanagan completed a "Fibromyalgia and Myofascial Pain Syndrome Functional Questionnaire." Flanagan stated that Stanley had multiple symptoms commonly associated with fibromyalgia, including trouble concentrating, inability to get known words out, short-term memory impairment, inability to deal with multiple sensory stimuli, and difficulty multitasking. She stated that emotional problems did not contribute to the severity of Stanley's symptoms. She stated that Stanley's experience of pain was "constantly" severe enough to interfere with her attention and concentration and that Stanley was severely limited in her ability to deal with workplace stress. She stated that she could not accurately evaluate Stanley's specific functional limitations in a competitive work situation but felt that Stanley would be absent from work more than three times per month.

Stanley went to the emergency room on September 9, 2006, August 18, 2007, September 7, 2007 and December 29, 2007 for treatment for headaches and migraines.

From at least July 2007 through August 2009, Stanley was treated by Dr. Douglas Wright, a neurologist with Associated Neurologists of Kingsport. On January 21, 2008, Stanley reported she was still having "fairly significant headaches." (R. at 441.) Dr. Wright concluded that Stanley had mild bilateral carpal tunnel syndrome with no evidence of progression, migraine headaches, and facial parasthesias (a migraine phenomenon). Dr. Wright wrote a letter on Stanley's behalf excusing her from jury duty because he felt that, given her severe headaches and nausea, she would have to leave frequently. He noted she was "alert and oriented," "well-groomed" and "in no apparent distress." (*Id.*)

In February 2008, Robert McGuffin, M.D., a state agency physician, reviewed the record and concluded that Stanley's impairments did not prevent her from performing a limited range of medium work. In June 2008, Shirish Shahane, M.D., reviewed the record and agreed with Dr. McGuffin's assessment.

In February 2008, Eugenie Hamilton, Ph.D., a state agency psychologist, reviewed the record and gave the opinion that Stanley had a nonsevere mental impairment. In June 2008, a second state agency psychologist, Louis Perrott, Ph.D., reviewed the record and concurred with Dr. Hamilton's opinion.

On April 28, 2008, Dr. Wright performed an occipital nerve block on Stanley to help with her migraine symptoms. On August 6, 2009, Dr. Wright noted that Stanley's migraines have been "controlled." (R. at 555.) He prescribed

Phenergan and Stadol to prevent ER visits.  During that visit, Stanley reported that since her last visit, her headaches were "definitely better" and that Klonopin "helped dramatically."  (R. at 556.)  Dr. Wright described Stanley as "alert" and "oriented" and "well-groomed."  (R. at 557.)  He noted "no major anxiety"  (R. at 558) and that she was "oriented to person, place and time."  (R. at 557.)  He observed that "recent and remote memory" and her "attention span and concentration" all appeared normal. (*Id.*)  He also noted that her physical strength was symmetric and normal throughout her body.

On January 20, 2009, Stanley's attorney referred her to John W. Ludgate, Ph.D., for an evaluation of her mental status.  Dr. Ludgate observed that Stanley was a "neatly-dressed and pleasant lady" who appeared "somewhat nervous."  (R. at 481.)  He noted that her attention span was adequate for testing, her comprehension normal and judgment and insight good.  Dr. Ludgate administered the Multiphasic Personality Inventory and the Structured Inventory of Malingered Symptomatology.  He found evidence of major depression and generalized anxiety disorder with no evidence of malingering.  He opined that Stanley would not be able to work at this time due to her medical and mental problems.  Dr. Ludgate also completed an Assessment of Ability to Do Work-related Activities (Mental). He opined that Stanley's ability was poor in the following areas:  deal with work stress; understand, remember and carry out complex job instructions; and behave

-7-

in an emotionally stable manner. Otherwise, he concluded that her abilities were good or fair. He anticipated that she would miss more than two days per month of work.

At her administrative hearing on November 30, 2009, Stanley testified that in 2005, after she had recovered from her carpal tunnel release surgery, she had tried to get her job at Wal-Mart back but the position had been filled. She also said that during 2005 and 2006, she worked cleaning her church once a week. The job involved mowing the yard, cleaning the church, mopping the floors, and sweeping the pews. It took two hours. She stopped because it got too much and she "just couldn't do it anymore." (R. at 36.) As to her fibromyalgia, she stated that she had a constant ache that never went away and that if she exerted herself she would have to lie down for two or three days. When asked about her migraine headaches and how they affected her, she responded that she got migraines at least twice a month and they would incapacitate her for two or three days. As to her depression, she claimed that she had started treatment for depression and anxiety in 2007 or 2008 and that she received counseling and takes Cymbalta. She explained that her depression has caused her to lose interest in many of the things she used to like to do and that she just wanted to stay home. She stated that if she did not have a migraine, her typical activities included cleaning the house, washing clothes and perhaps walking. She also attends church, speaks with her daughter on the phone

-8-

and visits her mother. She stated that she did not think she could work at an office job because her right hand swells and is very painful but she stated that she did Christmas shopping online.

A vocational expert testified that someone with Stanley's vocational background could perform food preparation or dining room or cafeteria attendant work, if limited to light work. If the exertional limitation was reduced to sedentary work, the vocational expert testified that the hypothetical person could work as a cashier or packer.

After reviewing Stanley's record and testimony at the hearing, the ALJ determined that Stanley had two severe impairments: fibromyalgia and migraine headaches. He found that these impairments, either alone or in combination, did not meet or medically equal one of the listed impairments. He determined that Stanley's other ailments were non-severe. He concluded that her depression was not severe because there were no medical records of mental health treatment and the record showed only mild limitation to her daily living, social functioning, and concentration, persistence or pace and no episodes of decompensation. Taking into account Stanley's limitations, the ALJ found that she had the residual functional capacity ("RFC") to perform sedentary work with the additional limitation that she can do work that frequently requires, balancing, stooping, kneeling, crouching, or crawling, and occasionally use ramps and climb stairs, ladders, ropes or scaffolds.

Based on the vocational expert's testimony, the ALJ concluded that Stanley was able to perform work that existed in significant numbers in the national economy and was therefore not disabled under the Act.

Stanley argues the ALJ's decision is not supported by substantial evidence. For the reasons below, I disagree.

### III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4) (2011). If

-10-

Case 1:10-cv-00061-JPJ-PMS   Document 21   Filed 11/20/11   Page 10 of 15   Pageid#: 654

it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id*. The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Stanley argues that the ALJ's finding that she had no severe mental impairment is not supported by the evidence. An impairment or combination of

impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities as defined by the regulation.[2] 20 C.F.R. § 404.1521 (2011). Stanley has been assessed as having depression by non-mental health professionals on several occasions and she described being depressed at her hearing. However, there were no medical records indicating emergency care or inpatient treatment or even basic counseling or outpatient treatment for her depression. She was consistently described by her treatment providers as pleasant, alert, oriented, and well-groomed. Her treatment providers did note periods of depression but those seemed to be in reaction to specific stressors, such as her daughter's miscarriage. None of her treatment providers referred her to a mental health professional. She responded well to the anti-depressant, anti-anxiety drug Cymbalta, which, though prescribed by her rheumatologist for her fibromyalgia and not her depression, seemed to help her mood.

The ALJ's decision to discount the opinion of Dr. Ludgate as to Stanley's mental impairment was within his discretion. *See* 20 C.F.R. § 404.1527(d)(2) (2011). The ALJ found that Dr. Ludgate's opinion as to Stanley's depression and

---

[2] Stanley argues that the ALJ applied the wrong legal standard to the question of whether her mental impairments were "severe," and, in effect, required her mental impairment to be a "listing level impairment" before he would find it severe. It is clear the ALJ applied the proper standard and assessed whether Stanley's depression and anxiety significantly limited her ability to perform basic work activities.

-12-

Case 1:10-cv-00061-JPJ-PMS   Document 21   Filed 11/20/11   Page 12 of 15   Pageid#: 656

its severity was not supported by the overall evidence in the record.[3] *See Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). It was therefore proper for the ALJ to discount Dr. Ludgate's opinion.

Stanley also argues that the ALJ's finding that she was able to perform sedentary work is irrational and not supported by substantial evidence. Stanley's argument seems to be that because two of the state agency doctors opined that she could do medium work, the ALJ's conclusion that she had the RFC to do sedentary work is not supported by the evidence. The ALJ's determination of a claimant's RFC is based all of the evidence in the record. *See* 20 C.F.R. § 404.1527 (2011). In this case, the ALJ considered the record as a whole, including the medical opinion evidence from the state agency's physicians and Stanley's own evidence of her physical state. The ALJ, quite reasonably and based on evidence put forth by Stanley herself, concluded that she could not perform medium work but rather should be limited to sedentary work with the additional limitations described.

Stanley also argues that the limitations listed by the ALJ in addition to her limitation to sedentary work are irrational because they are not consistent with

---

[3] The ALJ noted that Dr. Ludgate had only seen Stanley once and that his opinion that she was suffering from major depression contradicted the conclusions of two of Stanley's regular doctors and two state agency psychologists.

-13-

sedentary work. Stanley's RFC is a description of the "most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) (2011). Thus, the ALJ's RFC assessment is not a prescription of the job activities she must perform in a particular position. Rather, it is a list of all the possible functions Stanley could perform in the workplace and is based on the evidence in the record.

Stanley also argues that the ALJ's conclusion that her complaints of severe and chronic joint pain caused by her fibromyalgia were not credible was not supported by the evidence. Based in significant part on a review of the medical records from Arthritis Associates, the ALJ found that Stanley's fibromyalgia "could reasonably be expected to cause the alleged symptoms" of pain. (R. at 20.) The ALJ noted, however, that there were no physical manifestations supporting Stanley's claims of chronic severe pain (i.e. no significant weight loss or gain, no muscular atrophy, no use of assistive devices, no prolonged bed rest). Further, the evidence of Stanley's activities undermined her claims of disabling pain.

Stanley argues that the ALJ improperly discounted the evidence contained in the Fibromyalgia and Myofascial Pain Syndrome Functional Questionnaire completed by Michelle Flanagan, P.A. The ALJ clearly considered the Questionnaire but determined that its conclusions were unsupported and in conflict with other evidence in the record. This was well within his discretion. It was also appropriate for him to consider the fact that Flanagan is not an acceptable medical

source under 20 C.F.R. § 404.1513 (2011) when weighing this particular piece of evidence.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: November 20, 2011

/s/ James P. Jones
United States District Judge

-15-

Case 1:10-cv-00061-JPJ-PMS   Document 21   Filed 11/20/11   Page 15 of 15   Pageid#: 659